# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
June 27, 2017

v

TAIJA DENICE BUSH,

        Defendant-Appellant.

No. 330077
Macomb Circuit Court
LC No. 2015-000951-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DOMINIC LYNDELL WATERS,

        Defendant-Appellant.

No. 330589
Macomb Circuit Court
LC No. 2015-000940-FC

---

Before: SAWYER, P.J., and GLEICHER and RIORDAN, JJ.

PER CURIAM.

In Docket No. 330077, defendant Taija Denice Bush appeals as of right her jury trial convictions of armed robbery, MCL 750.529; conspiracy (armed robbery), MCL 750.157a; first-degree home invasion, MCL 750.110a(2); conspiracy (first-degree home invasion), MCL 750.157a; and unlawful imprisonment, MCL 750.349b. She was sentenced to 8 to 20 years' imprisonment for her armed robbery, first-degree home invasion, and conspiracy convictions, and 8 to 15 years' imprisonment for her unlawful imprisonment conviction.

In Docket No. 330589, defendant Dominic Lyndell Waters appeals as of right his jury trial convictions of conspiracy (armed robbery), MCL 750.157a; conspiracy (first-degree home invasion), MCL 750.157a; armed robbery, MCL 750.529; and first-degree home invasion, MCL 750.110a(2). He was sentenced to 12 to 20 years' imprisonment for each of his convictions.

-1-

In Docket No. 330077, we affirm defendant Bush's convictions, but remand for resentencing. In Docket No. 330589, we affirm defendant Waters' convictions and sentences. We do not retain jurisdiction.

## I. FACTUAL BACKGROUND

This case arises from the robbery of Brenda Wilson's[1] residence on Court Street in Mount Clemens, Michigan, on December 16, 2014. On the day of the incident, Brenda left work at 3:00 p.m. and immediately went to her mother's house, which was "kiddy-corner across the street" from her own home. When she arrived, Brenda began preparing chitterlings for Christmas. As she was cleaning them, Brenda looked out the window over the kitchen sink.

At some point between 4:00 p.m. and 6:00 p.m., at a time when it was still light outside, Brenda noticed a four-door gray car with a spoiler or "fin" on the back of it pull up on the opposite side of the street, directly across from the kitchen window. A black woman and three black men were inside. When Brenda looked up again, she noticed that the woman in the car was looking at her mother's house. At trial, Brenda identified defendant Bush as the woman in the car. Brenda testified that she made eye contact with Bush while she was "looking dead at her."

Ultimately, the three men exited the car and walked down the street toward Brenda's home. Brenda called her son, Randy Wilson, who was at her house, and told him that something strange was occurring. Randy said that he would go outside and see what was happening. Brenda saw her son walk down her driveway and then watched the three men walk "right past," within a few feet of her son, "and ke[ep] on walking." Brenda then saw defendant Bush pick up the men on the other street and drive away.[2]

At approximately 10:00 p.m. that evening, Randy called Brenda and asked for a ride to his girlfriend's house. After dropping him off, Brenda returned to her own home between 10:15 and 10:30 p.m. Brenda testified:

> I pulled in the driveway, I had all the Christmas lights on, and I got out of the car and I'm looking around. I always look over to my mother's house, my nephew's house and, you know, looking around before I go in the house so I can go to bed and go to work. I closed my car door, I walked up to my door, open[ed] the storm door and got to put the key in my door, and I heard some noise. I turned and I looked and three guys come running off from behind my house.

Brenda recognized the dark-colored Carhartt jacket that one of the perpetrators was wearing and then noticed that all three men were wearing the same clothes that they had been wearing earlier that day when they were on her street, except that they were now wearing ski

---

[1] Brenda Wilson will be referred to as "Brenda" in this opinion and her son, Randy Wilson, will be referred to as "Randy" or "Rand."

[2] At trial, Brenda stated her belief that the group was casing her home.

masks. The man wearing the Carhartt jacket had a gun and put it to Brenda's neck. After asking about the whereabouts of Brenda's son, the man with the Carhartt jacket told Brenda to be quiet and open the front door. Subsequently, the men tied Brenda up with "Rip Ties." Brenda was aware that she could get her hands out of the ties, but she "just left them behind [her]." The man in the Carhartt jacket pointed the pistol at Brenda and asked where her son was, where the money was, and where the weed was. Then, one of the men stayed with Brenda while the rest "were rambling and pulling stuff out." He briefly talked with her and ultimately took the cash that Brenda had in her purse.

The three men went to the back of the house, leaving Brenda alone. Brenda loosened her hands and got within four or five inches of the gun, which had been left in the dining room. Brenda then heard the men mention that they should check on her, so she sat back down and put her hands behind her back. The men continued to loot her house for 45 minutes to an hour. They also asked for the keys to her Cadillac, ultimately stealing her vehicle. However, Brenda noted at trial that during the incident, one of the robbers stated to someone on the phone that they could not find what they were looking for.

Before leaving, the robbers asked if there was anyone that they should call with Brenda's minute phone to help her because they did not want to leave Brenda there "like this[.]" When Brenda said no, one of the men tied up her ankles with duct tape. After the men left, Brenda cut off the duct tape with a kitchen knife and went to her neighbor's house to call the police.

Officer Shea Truxell of the Clinton Township Police Department testified that she was called to a suspicious vehicle just after 11:00 p.m. on December 16, 2014, which had been reported by a resident on the street. The car was parked approximately one block from the entrance to Court Street, in a position where it was possible to see Brenda's home. The car was an older silver Impala with circular rear lights. The driver of the vehicle was a black female, whom Truxell identified as defendant Bush at trial. When Truxell asked defendant Bush what she was doing, Bush stated "that she just wanted to get out of the house for a little while and just get away for a bit." Truxell asked her if there was anything the police should be concerned about at Bush's home, and Bush replied that "she just wanted to get out." Defendant Bush vaguely said "that she lived over on Clemens," but when Truxell attempted to clarify what she meant, Bush did not specify whether she meant the city of Mount Clemens or a Clemens Street, etc.

The next day, Sergeant Melissa Stevens and Detective Christopher Fraser of the Macomb County Sheriff's Department went to 1888 East Lafayette and conducted surveillance after running the license plate of the silver Impala that police observed the previous evening. At approximately 4:00 p.m., while they were watching the address, the silver Impala returned to the parking lot, and the driver went inside. Around 10 minutes later, a black male, whose description matched Brenda's description of the perpetrator (and who was later identified as Lujuan McCants), exited the residence with another man and entered the Impala with the license plate number seen near Brenda's home. The police followed the Impala until it arrived at an apartment complex on Kelly Road in Eastpointe at approximately 6:00 or 7:00 p.m.

McCants went inside the apartment building on Kelly Road and stayed inside for a couple of hours. The police then made contact with McCants when he exited the building. After McCants told the detectives that he had been inside a specific apartment with defendant Bush

(whom he identified as his girlfriend), Sergeant Stevens went upstairs to speak with Bush. The police were buzzed into the apartment building, and defendant Bush's mother allowed them to enter the unit. None of the items from the robbery were found in the home. However, Stevens and Lieutenant David Daniels both had an opportunity to speak with defendant Bush in the back bedroom of the residence.

Subsequently, the police made contact with Markenya Crigler, who lived at 1888 East Lafayette with her children and McCants. At the time, Crigler had a silver Impala, which was registered in her daughter's name. According to Crigler, McCants had access to the Impala whenever he wanted to use it. When the police came to Crigler's home, she let them inside and directed them to the various items that McCants had brought into the residence the previous night. Specifically, Crigler showed the police children's toys, hunting items, fur coats, a television, a DVD player, a Disney scooter, a remote-controlled car, and a "hot wheel," all of which had been stolen from Brenda's home. These items were later returned to Brenda.[3] Sergeant Stevens asked Crigler which coat McCants wore on a regular basis, and Crigler pointed out a brown Carhartt that was hanging in a closet.

After arresting McCants, the police recovered an Alcatel cell phone from McCants' belt. Subsequently, the police returned to defendant Bush's apartment and arrested her. At that time, the officers seized her Samsung Galaxy S4 cell phone. The police later obtained search warrants to access the contents of the seized cell phones.

During their investigation, the police discovered several incriminating text messages between McCants and defendant Waters that appeared to reference, among other things, defendant Waters' expectation that he would receive a "cut" from the robbery and McCants' refusal to provide anything to Waters. An analysis of data retrieved from McCants' and Waters' cell phones, as well as cell phone records from their service providers, revealed that text messages between the two men had been deleted.

On December 18, 2014, defendant Waters voluntarily came to the Macomb County Sheriff's Office with Officer Fraser and participated in an interview. Waters explained that he went with McCants to purchase marijuana from Brenda's son, "Rand," at approximately 4:00 or 4:30 p.m. on December 16, 2014. As further discussed later in this opinion, Waters confirmed during the interview that (1) he was expecting a cut from the robbery, and (2) he told McCants—after McCants mentioned a desire to return to Brenda's residence later, and knowing that McCants has robbed "a lot" of drug dealers in Detroit—that there could be cash inside of Brenda's home, given Rand's livelihood of selling marijuana. Additionally, even though defendant Waters denied that he set Rand up, and denied any involvement in actually executing the offense, he expressly confirmed that "it was fair enough to say" that he helped to formulate

---

[3] The stolen Cadillac was recovered and returned to Brenda as well.

the plan. However, Waters said that he did not know the other two men who helped McCants execute the robbery, and he was never aware that a woman was involved.[4]

## II. DOCKET NO. 330077

## A. SEARCH AND SEIZURE

Defendant Bush first argues that the trial court erred when it denied her motion to suppress the evidence obtained from her cell phone. Defendant is not entitled to relief because any error made by the trial court was harmless beyond a reasonable doubt.

## 1. STANDARD OF REVIEW

We recently restated the standard of review applicable to this issue in *People v Mahdi*, 317 Mich App 446, 457; 894 NW2d 732 (2016):

> "We review de novo a trial court's ultimate decision on a motion to suppress on the basis of an alleged constitutional violation." *People v Gingrich*, 307 Mich App 656, 661, 862 NW2d 432 (2014). We review for clear error any findings of fact made during the suppression hearing. *Id*. "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *Id*. (citation and quotation marks omitted). We review de novo the issue whether the Fourth Amendment was violated and the issue whether an exclusionary rule applies. *People v Corr*, 287 Mich App 499, 506; 788 NW2d 860 (2010). [Footnote omitted.]

## 2. ANALYSIS

As an initial matter, defendant Bush does not contend that the police's search of the *contents* of her cell phone pursuant to the search warrant was unlawful.[5] Rather, she contests the initial seizure of the phone from her home as being unlawful. It is undisputed that the police did not obtain a warrant for the initial seizure of the phone. Thus, the issue on appeal is limited to whether the police's seizure of the phone qualified under one of the exceptions to the warrant requirement. After holding an evidentiary hearing on defendant Bush's motion to suppress, the

---

[4] In Waters' written statement, he stated that he did not know that McCants was going to return and rob Rand until McCants called him later that night. Additionally, his statement does not include any indication that he was involved in the armed robbery.

[5] Defendant Bush conceded below and acknowledges on appeal that the police obtained a search warrant before searching the contents of the phone. See *Riley v Califonia*, ___ US ___; 134 S Ct 2473, 2493-2495; 189 L Ed 2d 430 (2014); *Mahdi*, 317 Mich App at 458 ("[T]he search of the contents of a cell phone generally requires a warrant unless a case-specific exception applies.").

trial court concluded that the consent and plain view exceptions to the warrant requirement were applicable in this case and justified the seizure of defendant Bush's cell phone.

Under the consent exception, a search and seize is permitted "if the consent is unequivocal, specific, and freely and intelligently given." *Mahdi*, 317 Mich App at 457-458. "Consent to search may be limited in scope, and consent may be revoked. The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Id.* (quotation marks and citation omitted).

The record includes no basis for concluding that the trial court clearly erred when it found—given its credibility determinations—that defendant's mother consented to the entry of the police into the home, and that defendant permitted the police to look at the contents of her phone for a specific, limited purpose on two separate occasions (*i.e.,* (1) to see what time McCants had called her, and (2) to look up McCants' phone number). However, the trial court made no finding that defendant ultimately consented *to the seizure of her phone*. Likewise, none of the witnesses who testified at the suppression hearing indicated that defendant provided consent to the seizure of her phone in addition to the two other limited instances of consent. See *Mahdi*, 317 Mich App at 461. Defendant's consent to the limited search of the content on her phone for two particular pieces of information did not constitute consent for the ultimate seizure of her entire phone. See *id.* Compare *People v Dagwan*, 269 Mich App 338, 343-346; 711 NW2d 386 (2005) (a case in which broad consent to search was provided by the defendant). The limited nature of defendant's consent in this case is especially obvious, as both Detective Fraser and defendant Bush testified at the suppression hearing that defendant limited her second instance of consent to finding McCants' phone number, and that she specifically stated that she did not want Detective Fraser to look at anything else. Thus, the trial court erred in concluding that seizure of defendant's cell phone was lawful under the consent exception to the warrant requirement.

Under the plain view exception to the warrant requirement, "a police officer [may] seize items in plain view if the officer is lawfully in the position to have that view and the evidence is obviously incriminatory." *Madhi*, 317 Mich App at 462 (quotation marks and citation omitted). "An item is obviously incriminatory, meaning its incriminating nature is immediately apparent, if without further search the officers have probable cause to believe the items are seizable." *Id.* (quotation marks and citation omitted). The seizure of an item pursuant to the plain view exception "is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Horton v California*, 496 US 128, 136; 110 S Ct 2301, 2307; 110 L Ed 2d 112 (1990) (quotation marks and citation omitted). "A fundamental characteristic of the [plain view] doctrine is that it is exclusively a seizure rationale. No searching, no matter how minimal, may be done under the auspices of the plain view doctrine." *People v Wilson*, 257 Mich App 337, 361; 668 NW2d 371 (2003), vacated in part on other grounds 469 Mich 1018 (2004), quoting *Champion*, 452 Mich at 101.

Given the trial court's credibility determinations, the trial court did not clearly err in concluding that defendant's mother consented to the police officers' entry into the home. Once

-6-

the police entered the home, they could properly seize anything in plain view as long as the incriminating nature of the evidence was immediately apparent. *Mahdi*, 317 Mich App at 462. As defendant recognizes in her brief on appeal, the parties do not dispute that defendant's cell phone was in plain view. However, it is not evident from the record that the incriminating nature of the cell phone was immediately apparent. The trial court simply concluded, "Further, the incriminating nature of the evidence, which was defendant's link to the armed robbery, was apparent," without providing any explanation as to how it was apparent. Additionally, there is nothing in the record supporting a conclusion that the incriminating nature of the phone was apparent "without further search." *Mahdi*, 317 Mich App at 462, quoting *Champion*, 452 Mich at 102 (quotation marks omitted).

Notably, the officers testified that they did not seize the cell phone when they first spoke with defendant Bush, despite her suspicious acts of "manipulating" the phone throughout the interview and the fact that her call record with McCants was not consistent with her statements. Accordingly, based on the officers' actions at that time, there is no indication that the incriminating nature of the cell phone was immediately apparent when they first encountered defendant Bush.[6] The testimony presented at the suppression hearing includes no indication that anything changed in the time between the police officers' first and second visits to defendant's apartment, such that the incriminating nature of the cell phone was somehow more apparent, or newly apparent, when the police saw her phone for a second time when they returned to arrest her. Likewise, the record includes no basis for concluding that the police developed or gained any reason to believe that incriminating evidence was on defendant Bush's phone during that intermediate period. Although the police found the stolen items at 1888 East Lafayette in between the officers' first conversation with defendant Bush and her arrest, the record includes no indication that this discovery made the incriminating nature of Bush's cell phone immediately apparent, as defendant Bush had no connection to the Lafayette residence. In sum, as in *Mahdi*, "the incriminating nature of the . . . cell phone was not immediately apparent. Instead, further investigation was necessary to establish a connection between the item[] and the suspected criminal activity." *Mahdi*, 317 Mich App at 462.

Contrary to the prosecution's claim on appeal, it does not appear that the exigent circumstances exception applies in this case. The exigent circumstances exception requires "probable cause that the premises to be searched contains evidence or suspects and that the circumstances constituted an emergency leaving no time for a warrant." *People v Davis*, 442 Mich 1, 24; 497 NW2d 910 (1993) (citations omitted). To qualify under the exception, "[t]he police must . . . establish the existence of an actual emergency on the basis of specific and objective facts indicating that immediate action is necessary to (1) prevent the imminent destruction of evidence, (2) protect the police officers or others, or (3) prevent the escape of a suspect." *People v Snider*, 239 Mich App 393, 408; 608 NW2d 502 (2000). The police officers

---

[6] The fact that Detective Fraser testified that he believed, in retrospect, that the officers present should have seized the phone if there was any suspicion does not undermine the evidence plainly indicating that the other officers did not find the incriminating nature of the phone immediately apparent at that time.

testified at the suppression hearing that they were concerned that defendant Bush was deleting evidence from her phone while she was manipulating it during their conversations with her. However, they did not seize her phone when they had that suspicion, and there was no risk that Bush could continue to destroy evidence when the seizure occurred, as the phone was seized when defendant Bush was arrested. Likewise, there is no other evidence in the record indicating a risk that evidence inside, or associated with, her phone would be destroyed at that time. And, again, the police apparently did not see this risk as significant enough to initially seize the phone pursuant to the exigent circumstances exception to the warrant requirement when they first spoke with defendant Bush, as they left the phone with her when they exited the residence.

Additionally, it is not clear that the cell phone would fall within the scope of the inevitable discovery doctrine. "The inevitable-discovery rule permits the admission of evidence obtained in violation of the Fourth Amendment if the prosecution establishes by a preponderance of the evidence that the information inevitably would have been discovered through lawful means." *Mahdi*, 317 Mich App at 469.

> This Court has cited several factors in determining whether the inevitable-discovery rule applies, including (1) whether the legal means were truly independent, (2) whether the use of the legal means and the discovery by the legal means were truly inevitable, and (3) whether application of the inevitable-discovery doctrine could incentivize police misconduct or significantly weaken the protection provided under the Fourth Amendment. [*Id*. (citation omitted).]

Here, it is questionable "whether the legal means were truly independent," as the search warrant for the contents of the phone was obtained after defendant was arrested for the unrelated offense and after the police already had the phone in their possession. *Id*. Regardless, even if the seizure of the phone did not fall within one of the exceptions to the warrant requirement or under the inevitable discovery doctrine, it is apparent from the record that the admission of evidence from defendant Bush's cell phone was harmless beyond a reasonable doubt.

A preserved, nonstructural error is harmless, and reversal is not required, if "the beneficiary of the error . . . prove[s], and the court . . . determine[s], beyond a reasonable doubt that there is no reasonable possibility that the evidence complained of might have contributed to the conviction." *People v Anderson*, 446 Mich 392, 405-406; 521 NW2d 538 (1994) (quotation marks and citations omitted). Stated differently, "[a] constitutional error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *People v Mass*, 464 Mich 615, 640; 628 NW2d 540 (2001) (quotation marks and citation omitted).[7]

Although there was conflicting evidence in the record concerning whether defendant Bush actually was present when the perpetrators came to Brenda's home earlier in the day on December 16, 2014, there was overwhelming evidence, unrelated to the data extracted from her cell phone, that defendant Bush played a role in the offense. Most significantly, Officer Truxell

---

[7] See also *Neder v United States*, 527 US 1, 15-16; 119 S Ct 1827, 1837; 144 L Ed 2d 35 (1999).

came into contact with defendant Bush at approximately 11:00 p.m.—at which time the robbery was still occurring, according to Brenda's testimony—while Bush was inside a silver Impala associated with McCants.[8] It is especially noteworthy that defendant Bush was parked approximately one block from the entrance to Court Street, in a position where it was possible to see Brenda's home.

Later, after officers were instructed to be on the lookout for a silver Impala that may have been involved in a home invasion, Officer Truxell disseminated the license plate number from the Impala in which Bush had been sitting. The police then connected the same silver Impala in which Bush was found to McCants' Lafayette address. Importantly, Crigler's testimony confirmed that, in the hours after the robbery, McCants returned to the Lafayette address with the stolen items in the same silver Impala that defendant Bush had been driving earlier that night.

Although defendant Bush denied any involvement in the robbery and specifically denied that she had been in Mount Clemens, she expressly admitted to police that she was with McCants that evening and provided vague or contradictory information regarding their activities and phone calls. Additionally, Lieutenant Daniels testified that defendant Bush "covered her face" and "began to cry slightly" after he told her that the police "believed her boyfriend was involved in a home invasion," "that a Clinton Township police officer had been called to the scene and she identified a black female driver in the vehicle at the time of the home invasion," and that it was likely that the Clinton Township officer would identify Bush as the driver if she saw Bush's picture.

Contrary to defendant Bush's characterization of the record, much of the incriminating cell phone evidence admitted at trial concerning defendant Bush came from cell phone records *provided by defendant Bush's cell phone service provider*, not from the contents of her phone. The record shows that text messages to or from Bush were found on McCants' phone, meaning that the police could have obtained defendant Bush's phone number through a source other than her own phone. Additionally, the data *from the cell phone service providers*, not defendant Bush's cell phone itself, demonstrated increased contact between McCants and Bush on the day of the robbery and showed that defendant Bush's cell phone was in or near Mount Clemens that day. See *United States v Carpenter*, 819 F3d 880 (CA 6, 2016), cert gtd ___ US ___; ___ S Ct ___; ___ L Ed 2d ___ (2017). A report including information from defendant Bush's phone was admitted at trial, but only a handful of text messages from defendant Bush's phone were noted during the cell phone analyst's testimony. Further, it is noteworthy that the defense heavily relied on one of these text messages—a message from Bush stating, "Oh, okay, I'll get dressed," at 5:01 p.m.—as exculpatory evidence indicating that she was not present when Brenda observed other individuals casing her house.

---

[8] Notably, during his closing argument, defense counsel expressly stated that the defense was not denying that defendant Bush was the woman with whom the police came into contact that night; instead, the defense's position was that defendant was merely present and had no knowledge of or involvement in the robbery.

There was overwhelming evidence of defendant Bush's guilt apart from any evidence retrieved from her cell phone. Even if the trial court erred when it failed to grant defendant's motion to suppress, the record clearly shows that this error was harmless beyond a reasonable doubt. Defendant Bush is not entitled to reversal on this basis. See *Mass*, 464 Mich at 640; *Anderson*, 446 Mich at 405-406.

## B. JURY INSTRUCTIONS

Next, defendant Bush argues that she is entitled to a new trial based on the jury instructions provided by the trial court. We disagree.

## 1. STANDARD OF REVIEW

As an initial matter, defendant Bush waived her right to appeal any instructional error when defense counsel expressly affirmed the trial court's instructions when it finished reading them. See *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011); *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). Nevertheless, even if this issue had not been waived, it is, at most, unpreserved, as a party must object or request a particular jury instruction before the jury deliberates to preserve the error for review. MCR 2.512(C); *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003), disapproved on other grounds 496 Mich 967 (2003); *People v Sabin*, 242 Mich App 656, 657; 620 NW2d 19 (2000). Although defendant Bush initially objected to the instruction provided by the trial court, she did not object to the means by which the trial court rectified the error. Rather, again, she expressly approved the ultimate manner in which the trial court instructed the jury, which is the gravamen of her claim on appeal.

Our review of unpreserved issues is limited to plain error affecting defendant's substantial rights. *People v Jackson*, 313 Mich App 409, 421; 884 NW2d 297 (2015); see also *Sabin*, 242 Mich App at 657 ("Absent an objection or request for an instruction, this Court will grant relief only when necessary to avoid manifest injustice."). To demonstrate such an error, a defendant must show that (1) an error occurred, (2) the error was clear or obvious, and (3) "the plain error affected [the defendant's] substantial rights," which "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Even if a defendant establishes a plain error that affected her substantial rights, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks and citation omitted; second alteration in original).

## 2. ANALYSIS

While this issue is waived, we briefly note that defendant's claim has no merit.

Defendant's claim of error arises from the instructions provided by the trial court regarding the extent to which the jury could consider defendant Waters' statements to the police in deciding defendant Bush's guilt. Although the trial court initially instructed the jury that it could not consider defendant Waters' statement in determining defendant Bush's guilt or innocence, it later repudiated that instruction, clearly indicating that the jury could, in fact,

-10-

consider defendant Waters' statement for that purpose. During this exchange, the court emphasized that the jury should disregard its earlier instruction through the following statements:

> *THE COURT:* Okay. Go back to that last statement, sorry about that, where it begins defendant Dominic Waters' statement, just cross it out completely. We're not going to use that one. Cross it out and if you want to rip it out of your packet and leave it on the floor so you don't mistakenly keep it in there, we consider it, okay? Correct, Mr. Rodnick?

> [*Bush's Defense Counsel*]: Yes, your honor.

"It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Defendant Bush identifies no authority on appeal in support of her claim that the trial court's failure to ensure that each juror physically removed the instruction from his or her jury packet undermines or rebuts the presumption that the jurors followed the clear and unequivocal instructions ultimately provided by the court on the record. Likewise, defendant has identified no evidence in the record that the jurors did, in fact, fail to follow the instructions eventually provided by the court. Even if the trial court's change in the instructions initially generated some confusion, it is clear that the trial court specifically clarified the instructions that the jury was supposed to follow. A jury will not be presumed to have followed an incorrect instruction that has been corrected by the trial court. *People v Hardesty*, 139 Mich App 124, 132; 362 NW2d 787 (1984).

Defendant Bush has failed to show that the jury instructions provided by the trial court constituted plain error affecting her substantial rights, or otherwise caused manifest injustice. See *Jackson*, 313 Mich App at 421; *Sabin*, 242 Mich App at 657.

## C. SUPPRESSION OR CONCEALMENT OF EVIDENCE

In her Standard 4 brief, defendant Bush argues that her constitutional rights were violated when the prosecution "suppressed and failed to disclose exculpatory evidence to the defense." We disagree.

### 1. STANDARD OF REVIEW

Defendant failed to preserve this issue below. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 65 (2007); *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005), citing MCR 2.611(A)(1)(f), MCR 2.612(C)(1)(b), and *People v Darden*, 230 Mich App 597, 605-606, 585 NW2d 27 (1998). Unpreserved constitutional and nonconstitutional issues are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 762-765.

### 2. ANALYSIS

Under MCR 6.201(A)(2), the prosecution must, upon request, disclose to the defendant "any written or recorded statement . . . pertaining to the case by a lay witness whom the [prosecution] may call at trial . . . ." Additionally, upon request, the prosecuting attorney must provide the defendant with "any exculpatory information or evidence known to the prosecuting attorney" and "any police report and interrogation records concerning the case, except so much

of a report as concerns a continuing investigation." MCR 6.201(B)(1) and (2). Furthermore, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963); see also *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014) (quoting *Brady*). The elements of a *Brady* violation are as follows: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *Chenault*, 495 Mich at 155.

Defendant Bush first argues that the prosecution committed a *Brady* violation when it failed to make the contents of Brenda's police statement available to the defense. Even if the prosecution actually failed to provide this statement to the defense, defendant Bush has failed to provide any support for her claim that the statement contained exculpatory information, or any information that would have been relevant and helpful to her case. Instead, she merely claims that she "was prejudiced," without providing any explanation as to how she was prejudiced. There is nothing in the record indicating that Brenda's witness statement would have included any information that was favorable to Bush, see *Chenault*, 495 Mich at 150 ("Evidence is favorable to the defense when it is either exculpatory or impeaching."), and there is no due process violation if the statement contained material that was not favorable to the accused. *Brady*, 373 US at 87.

Likewise, "undisclosed evidence will be deemed material only if it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *People v Henry (After Rem)*, 305 Mich App 127, 157; 854 NW2d 114 (2014) (quotation marks and citations omitted); see also *Chenault*, 495 Mich at 150. Defendant has not shown, or even argued, that the content of Brenda's statement could undermine confidence in the verdict. Thus, defendant Bush has failed to establish a *Brady* violation, *Chenault*, 495 Mich at 155, or a plain error affecting her substantial rights, see *Carines*, 460 Mich at 763.

Next, defendant Bush argues that the prosecution committed a *Brady* violation when it failed to provide the full report containing her cell phone records from Sprint PCS. Once again, the record does not support defendant's claim. To the contrary, the record clearly shows that the prosecution did not suppress the full report containing her cell phone records. In fact, *all* of the records from the cell phone companies, including those concerning defendant Bush's phone, were admitted as an exhibit at trial on August 25, 2015, at the prosecution's request. Notably, before the records were admitted, the prosecution specifically confirmed with Detective Fraser that the exhibit included, (1) on a thumb drive, "[a]ll the cell phone records" "[t]hat were sent from the phone companies" as well as (2) paper copies of keys from the companies, which could be used to interpret the data in the records. Defendant's attorney stated that he had no objection to the admission of that exhibit. The next day, the trial court also recognized that the exhibit containing the cell phone records had been admitted the previous day.

Because the phone records were, in fact, admitted as evidence, defendant Bush cannot establish that the prosecution committed a *Brady* violation, see *Chenault*, 495 Mich at 149-151,

155, or otherwise committed a plain error affecting her substantial rights, see *Carines*, 460 Mich at 763.[9]

## D. IDENTIFICATION TESTIMONY

Next, defendant argues in her Standard 4 brief that her due process rights were violated when the trial court admitted Brenda's "unreliable and unduly suggestive identification into evidence." We disagree.

### 1. STANDARD OF REVIEW

Because defendant did not object to Brenda's identification of defendant Bush before or at trial, this issue is unpreserved and reviewed for plain error affecting substantial rights. *People v McCray*, 245 Mich App 631, 638; 630 NW2d 633 (2001).

### 2. ANALYSIS

To establish that an identification procedure violated her right to due process, defendant Bush must show that the procedure was "so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Williams*, 244 Mich App 533, 542; 624 NW2d 575 (2001) (quotation marks and citation omitted). If a witness was exposed to an impermissibly suggestive pretrial identification procedure, her in-court identification of the defendant will not be allowed unless the prosecutor establishes by clear and convincing evidence that the in-court identification has an untainted, independent basis. *People v Gray*, 457 Mich 107, 115; 577 NW2d 92 (1998). The due process protections concerning unnecessarily suggestive identification procedures do not apply in the absence of state action. *People v Farrow*, 183 Mich App 436, 441; 455 NW2d 325 (1990); see also *Perry v New Hampshire*, 565 US 228, 248; 132 S Ct 716, 730; 181 L Ed 2d 694 (2012).

Here, defendant does not argue that a pretrial identification procedure was improper or unduly suggestive. It is undisputed that neither the police nor the prosecution ever conducted a live lineup, photographic lineup, or show up. Rather, defendant's argument is premised, in part, on the fact that no pretrial identification was conducted. However, a criminal defendant has no constitutional or statutory right to a pretrial identification in Michigan. *People v Farley*, 75 Mich App 236, 238; 254 NW2d 853 (1977). Because there was no pretrial identification in this case, the victim's identification testimony was fully admissible. The trial court correctly allowed the jury to assess the credibility of Brenda's identification testimony. See *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000).

---

[9] Contrary to her claim on appeal, defendant also has failed to demonstrate that the prosecution knowingly presented perjured testimony. See *People v Gratsch*, 299 Mich App 604, 619-620; 831 NW2d 462 (2013), vacated in part on other grounds 495 Mich 876 (2013); *People v Smith*, 498 Mich 466, 475-477; 870 NW2d 299 (2015).

Defendant Bush also argues that she is entitled to a new trial because Brenda saw her picture in a newspaper prior to trial, which constituted an unduly suggestive pretrial procedure. Defendant has identified no evidence that Brenda's viewing of the newspaper was arranged by law enforcement or that police officers led Brenda to identify defendant as the perpetrator of the crimes. Because there was no state action involved in Brenda's viewing of defendant in the newspaper, due process does not require suppression of the subsequent identification. See *Perry*, 565 US at 248. Additionally, this Court rejected an identical claim in *People v Barnett*, 163 Mich App 331, 335-336; 414 NW2d 378 (1987), where, as here, it was apparent that the witness's identification testimony was based on her own perceptions of the defendant, not on the photograph in the newspaper. See also *People v Kurylczyk*, 443 Mich 289, 313; 505 NW2d 528 (1993).

Further, even if this Court assumes arguendo that the circumstances surrounding Brenda's in-court identification of defendant Bush were suggestive, a review of the record shows that the evidence at trial sufficiently demonstrated an independent basis for that identification. See *Gray*, 457 Mich at 115-116, quoting *People v Kachar*, 400 Mich 78, 95-96; 252 NW2d 807 (1977) (listing factors courts should consider in determining whether an independent basis exists for the admission of an in-court identification); *Kurylczyk*, 443 Mich at 306. The jury was free to assess the weight and credibility of Brenda's identification in light of (1) the distance between the women, (2) the fact that Brenda made her observations through a window, (3) the fact that Brenda had worked a full day before observing the vehicle, (4) the fact that Brenda later saw a picture of defendant Bush in the newspaper, (5) any other circumstances that could weaken Brenda's ability to accurately observe the woman in the vehicle, and (6) other evidence in the record indicating that defendant Bush was not present at the scene when Brenda claims that she saw her. Although defendant Bush contends that there are reasons to question the reliability of Brenda's identification, defendant was not prevented from exploring this issue at trial, and the record clearly reveals that defense counsel did so. It was up to the jury to determine whether Brenda's identification was reliable and credible in light of the circumstances highlighted by the defense. See *Davis*, 241 Mich App at 700.

Defendant Bush has failed to establish that she is entitled to relief based on Brenda's identification testimony at trial.

## E. OV 10

Next, defendant contends in her Standard 4 brief that the trial court erred when it assessed 15 points for OV 10. We agree and remand for resentencing.

### 1. STANDARD OF REVIEW

Defendant failed to preserve this claim by raising it "at sentencing, in a motion for resentencing, or in a motion to remand filed in the Court of Appeals." *People v Loper*, 299 Mich App 451, 456; 830 NW2d 836 (2013). See also *People v Jones*, 297 Mich App 80, 83; 823 NW2d 312 (2012). Thus, this Court's review is limited to plain error affecting defendant's substantial rights. *Jones*, 297 Mich App at 83, citing *Carines*, 460 Mich at 763-764.

### 2. ANALYSIS

-14-

Although defense counsel technically waived this issue, defendant is entitled to resentencing in light of the Michigan Supreme Court's release of *People v Gloster*, 499 Mich 199; 880 NW2d 776 (2016), after defendant's sentencing in October 2015. The trial court erred in assessing 15 points for OV 10 solely based on the predatory conduct of defendant Bush's co-offenders.

OV 10 pertains to the exploitation of a vulnerable victim. MCL 777.40. An assessment of 15 points is appropriate when "[p]redatory conduct was involved." MCL 777.40(a). For purposes of scoring OV 10, " '[p]redatory conduct' means preoffense conduct directed at a victim, or a law enforcement officer posing as a potential victim, for the primary purpose of victimization." MCL 777.40(3)(a). In *Gloster*, 499 Mich at 205-207, the Michigan Supreme Court explained:

> MCL 777.40 contains no language directing a court to assess a defendant points for OV 10 on the basis of conduct by a defendant's co-offenders in multiple-offender situations. This is in direct contrast to OVs 1, 2, and 3, all of which specifically direct a court to assign a defendant the same number of points that all offenders are assessed in multiple-offender cases. . . . .
>
> Courts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there. Because the Legislature has explicitly provided that all offenders in a multiple-offender situation should receive the same score for OVs 1, 2, and 3, but excluded that language from other OVs, we conclude that a defendant shall not have points assessed solely on the basis of his or her co-offenders' conduct unless the OV at issue specifically indicates to the contrary. To conclude otherwise would require this Court to read the multiple-offender language into the OV at issue, in this case OV 10, in violation of our principles of statutory interpretation. [Quotation marks and citations omitted.]

Here, as defendant Bush claims, there is no evidence that she participated in predatory conduct herself. Rather, the only incidents of predatory conduct related to the offense were performed by the other perpetrators, while defendant Bush was in a vehicle a block or more away from the scene. This case is factually similar to *Gloster*, where "the trial court supported its score by explaining that two of the people defendant drove to Hamtramck 'went out to the corner to watch for an appropriate victim . . . .' " *Gloster*, 499 Mich at 209. Similarly, the evidence admitted at trial consistently indicated that defendant Bush remained in the car during the offense and did not play a role in waiting for or approaching Brenda during the robbery. Thus, the trial court erred in assessing 15 points for OV 10.

Without the 15 points erroneously assessed for OV 10, defendant's total OV score decreases from 50 points to 35 points. As defendant argues, this change affects the minimum range calculated under the sentencing guidelines, reducing the minimum range from 81 to 135 months to 51 to 85 months. See MCL 777.62. Thus, defendant has established a plain error affecting her substantial rights, which requires resentencing, as the erroneous score affected the guidelines minimum range. See *People v Kimble*, 470 Mich 305, 312-313; 684 NW2d 669 (2004); see also *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

-15-

## F. INEFFECTIVE ASSISTANCE OF COUNSEL

Lastly, defendant Bush raises multiple ineffective assistance of counsel claims in the brief on appeal filed by her appellate counsel and in her Standard 4 brief. We reject these claims.

### 1. STANDARD OF REVIEW

"[A] defendant must move the trial court for a new trial or evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). Defendant did not move for a new trial or file a motion for a *Ginther*[10] hearing in the trial court. Thus, our review of this unpreserved issue is limited to mistakes apparent from the record. *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014); *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000). Stated differently, "[i]f the appellate record does not support defendant's assertions, [s]he has waived the issue." *Sabin*, 242 Mich App at 659.

"A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008), citing *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

> Effective assistance of counsel is presumed and defendant bears the burden of proving otherwise. To succeed on a claim of ineffective assistance of counsel, the defendant must show that, but for an error by counsel, the result of the proceedings would have been different, and that the proceedings were fundamentally unfair or unreliable.[11] The defendant bears a heavy burden on these points. Defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. [*Petri*, 279 Mich App at 410-411 (quotation marks and citations omitted).]

Additionally, defendant Bush carries the burden of establishing the factual basis of her claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999), quoting *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973).

---

[10] *People v Ginther*, 390 Mich 436, 443, 212 NW2d 922 (1973).

[11] See also *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012) ("[I]n order to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' "), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

## 2. ANALYSIS

Most of defendant Bush's ineffective assistance of counsel claims are related to her other claims raised on appeal. To the extent that she challenges defense counsel's (1) response to the erroneous instruction provided by the trial court concerning the jury's consideration of defendant Waters' statements; (2) failure to file a motion to suppress Brenda's in-court identification of defendant Bush; (3) failure to file a motion requesting a *Wade*[12] hearing concerning Brenda's identification testimony; and (4) failure to object to the prosecution's alleged suppression of Brenda's written police statements and the full report containing defendant Bush's phone records, these claims fail for the same reasons discussed earlier in this opinion. We cannot find defense counsel ineffective for failing to file a frivolous motion or make a futile objection. See *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003); *People v Johnson*, 315 Mich App 163, 175; 889 NW2d 513 (2016).[13]

Defendant Bush also claims that defense counsel provided ineffective assistance when he failed to interview Brenda, Cringler, Deputy Daniel Cikota, and Investigator Joseph Duncan. As an initial matter, the record does not support defendant Bush's claim that defense counsel failed to interview the named witnesses, as there is no record evidence indicating whether or not defense counsel interviewed those witnesses before trial. Thus, defendant has waived these arguments, *Sabin*, 242 Mich App at 659, as she has failed to establish the factual predicate of her claim, *Hoag*, 460 Mich at 6.

Furthermore, defendant Bush's claim concerning defense counsel's purported failure to interview witnesses is largely related to (1) her prior claims concerning the full report of her cell phone records and (2) discrepancies in the record that may undermine the reliability and credibility of Brenda's identification of her. For the reasons previously discussed, defendant has failed to establish any error with regard to that evidence, and, again, counsel will not be found ineffective for failing to file a futile motion or raise a meritless objection. See *Riley*, 468 Mich at 142; *Johnson*, 315 Mich App at 175. Likewise, for the same reasons, defendant cannot establish that there is a reasonable probability that any of the purported errors concerning this evidence, or that defense counsel's alleged failure to interview or investigate, affected the outcome of the trial. See *Petri*, 279 Mich App at 410-411.

Defendant Bush also argues that defense counsel's purported failure to interview the witnesses inhibited his ability to identify discrepancies in the time frames referenced by the witnesses, such that he failed to adequately pursue her "mere presence" defense. However, a review of the record, including the testimony quoted in defendant's Standard 4 brief, reveals that defense counsel elicited testimony in support of defendant's claim and emphasized evidence

---

[12] *United States v Wade*, 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).

[13] Additionally, with regard to her claim that defense counsel's response to the trial court's jury instructions constituted ineffective assistance, defendant has failed to demonstrate the requisite prejudice. See *People v Gaines*, 306 Mich App 289, 300; 856 NW2d 222 (2014).

during his opening and closing arguments—including discrepancies in the time frames mentioned by the witnesses and the text sent by defendant at 5:01 p.m. stating, "Okay, I'll get dressed"—suggesting that defendant Bush had no involvement in the robbery and was merely present when it occurred. Thus, defendant cannot claim ineffective assistance of counsel on this ground, as the record shows that counsel vigorously pursued defendant's "mere presence" defense in the manner that defendant Bush advocates on appeal. See *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) ("Trial counsel is responsible for preparing, investigating, and presenting all substantial defenses," meaning defenses "that might have made a difference in the outcome of the trial.") (quotation marks and citations omitted).

Defendant argues that defense counsel was ineffective when he failed to object to the trial court's scoring of OV 10, but we need not consider this issue from an ineffective assistance of counsel perspective given our discussion of the proper scoring of OV 10 earlier in this opinion. To the extent that defendant Bush's Standard 4 brief includes additional ineffective assistance of counsel claims under this issue, we deem them abandoned, as defendant has not articulated a factual or legal basis for these claims. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority.").

### III. DOCKET NO. 330589

### A. STATEMENT TO POLICE

Defendant Waters first contends that he is entitled to a new trial based on the trial court's failure to suppress all of the statements that he made to the police, both before and after he waived his *Miranda*[14] rights. We disagree.[15]

### 1. STANDARD OF REVIEW

Because defendant Waters' failed to preserve this issue, see *Metamora Water Serv, Inc*, 276 Mich App at 382; *People v Gentner, Inc*, 262 Mich App 363, 368; 686 NW2d 752 (2004), our review is limited to plain error affecting his substantial rights, *Carines*, 460 Mich at 762-765.

---

[14] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[15] Defendant Waters appears to briefly suggest in his brief on appeal that the district court erred when it bound him over for trial based on Detective Fraser's testimony, and when it failed to "address" the purported custodial interrogation of Waters at the preliminary examination. To the extent that defendant Waters intended to claim that his bindover was improper, he has abandoned that claim. See *People v Miller*, 238 Mich App 168, 172; 604 NW2d 781 (1999); *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Furthermore, "an evidentiary deficiency at the preliminary examination is not ground for vacating a subsequent conviction where the defendant received a fair trial and was not otherwise prejudiced by the error." *People v Hall*, 435 Mich 599, 601; 460 NW2d 520 (1990).

Further, the defense waived this issue at trial. On the second day of jury selection, while the trial court was addressing other pretrial matters, the prosecution explained that it planned to omit from its case in chief any statements that Waters made before he waived his *Miranda* rights, implying that it still planned to admit his recorded interview. When the court inquired as to whether defendant Waters was requesting that outcome, Waters' counsel replied, "I don't have any objection. I originally put together a motion for that. I'm please[d] with the prosecutor's position. I have nothing further, your Honor." After clarifying that defense counsel had no objection the prosecution's decision to exclude the pre-*Miranda* statements, the trial court stated that the statements made in the police vehicle would be excluded. Subsequently, Waters' defense counsel stated that he had no objection to the admission of Waters' interview with Detective Fraser. Defense counsel's express satisfaction with the admission of Waters' statements constitutes waiver of this issue. See *Kowalski*, 489 Mich at 503; *Carter*, 462 Mich at 215.

## 2. ANALYSIS

Regardless of the waiver, defendant Waters has failed to establish any error in the admission of his statements to the police.

> *Miranda* warnings are not required unless an individual is subjected to custodial interrogation. In determining whether a person is effectively "in custody," the pertinent inquiry is whether there is restraint on freedom of movement in any significant way such as of the degree associated with a formal arrest. Custody must be determined on the basis of how a reasonable person in the suspect's situation would perceive his or her circumstances and whether the reasonable person would believe that he or she was free to leave. Whether an individual is effectively "in custody" is based on the totality of the circumstances. [*People v Roberts*, 292 Mich App 492, 504-505; 808 NW2d 290 (2011) (citations omitted).]

Contrary to defendant's characterization of the record, none of his statements admitted at trial were custodial statements that he made before waiving his *Miranda* rights. Defendant repeatedly claims that the police arrested him before taking him to the sheriff's office in a squad car. However, Detective Fraser's testimony at the preliminary examination blatantly undermines defendant's claim. It is apparent from Fraser's testimony—and further confirmed by defendant Waters' obvious surprise when he was arrested at the end of his recorded interview—that defendant Waters voluntarily accompanied Detective Fraser and another officer to the sheriff's office. There is nothing in the record that rebuts Detective Fraser's testimony indicating that defendant Waters was *not under arrest* when he traveled to the sheriff's office; that he *voluntarily* accompanied Fraser and the other officer; and that he *voluntarily* spoke with them during the drive. See *Roberts*, 292 Mich App at 504-505. Furthermore, consistent with the prosecution's commitment at the beginning of the trial, none of the statements that defendant made prior to waiving his *Miranda* rights were admitted at trial. Defendant has failed to establish a plain error affecting his substantial rights with regard to any statements that he made before waiving his *Miranda* rights in the interview room. See *Carines*, 460 Mich at 763.

Defendant Waters also argues that his statements should have been suppressed because he was provided *Miranda* warnings "midstream," and the recorded interview played for the jury

covered the same topics that were discussed before the *Miranda* warnings were provided. If the police deliberately refrain from advising a defendant of his rights in order to obtain a confession and, after obtaining the confession, then advise the defendant of his rights and obtain the same confession, the *Miranda* warning is ineffective, and the postwarning statement is inadmissible. *Missouri v Seibert*, 542 US 600, 616-618; 124 S Ct 2601; 159 L Ed 2d 643 (2004) (plurality opinion); *id.* at 620-621 (KENNEDY, J., concurring). Here, however, there is absolutely no evidence in the record that would support a finding that the police intentionally failed to apprise defendant Waters of his rights in order to obtain a confession at that time. To the contrary, it appears that the police intentionally did not seek a confession from Waters in the vehicle in light of the fact that the unmarked car was not equipped with recording equipment and they were en route to an interview room where defendant Waters' statement would be taped. Thus, the factual circumstances of defendant Waters' ride to the sheriff's office and his subsequent interrogation make this case distinguishable from other cases, such as *Seibert*, 542 US 600, where *Miranda* warnings are provided mid-interrogation after the police have already secured a confession from the defendant. See also *Oregon v Elstad*, 470 US 298, 314; 105 S Ct 1285; 84 L Ed 2d 222 (1985) (holding that where police do not use "deliberately coercive or improper tactics" while questioning a defendant, but fail to advise him of his *Miranda* rights, the "subsequent administration of *Miranda* warnings . . . ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."); *United States v Carter*, 489 F3d 528, 534 (CA 2, 2007) ("[U]nder *Elstad*, if the prewarning statement was voluntary, then the postwarning confession is admissible unless it was involuntarily made despite the *Miranda* warning.").

Defendant has failed to establish that the trial court's failure to suppress his statements constituted a plain error affecting his substantial rights. *Carines*, 460 Mich at 763.

## B. SUFFICIENCY OF THE EVIDENCE

Lastly, defendant Waters argues that the prosecution presented insufficient evidence to support his convictions. We disagree.

## 1. STANDARD OF REVIEW

This Court reviews a challenge to the sufficiency of the evidence *de novo*. *People v Henderson*, 306 Mich App 1, 8-9; 854 NW2d 234 (2014). "We examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013) (quotation marks and citation omitted). This Court's review is deferential, as "[w]hen assessing a challenge to the sufficiency of evidence, the trier of fact, not the appellate court, determines what inferences may be fairly drawn from the evidence and the weight to be accorded those inferences." *People v Malone*, 287 Mich App 648, 654; 792 NW2d 7 (2010), overruled in part on other grounds by *People v Jackson*, 498 Mich 246, 268 n 9 (2015); see also *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) ("The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict."). Accordingly, in reviewing a challenge to the sufficiency of the evidence, "[w]e do not interfere with the jury's assessment of the weight and credibility of witnesses or the evidence . . . ." *Dunigan*, 299 Mich App at 582. "Circumstantial evidence and

-20-

reasonable inferences arising [from the evidence] may constitute proof of the elements of the crime." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

## 2. ANALYSIS

It is important to note, as an initial matter, that defendant Waters does not challenge whether the crimes were actually committed by the other perpetrators. Rather, he challenges the sufficiency of the evidence demonstrating his participation in a conspiracy to commit those crimes, and he implicitly challenges the aiding and abetting theory serving as the basis of his nonconspiracy convictions.

The elements of armed robbery are as follows:

(1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007) (footnotes omitted).]

The elements of first-degree home invasion are: (1) the defendant broke and entered a dwelling or entered the dwelling without permission; (2) when the defendant did so, he intended to commit a felony, larceny, or assault, or he actually committed a felony, larceny, or assault while entering, being present in, or exiting the dwelling; and (3) another person was lawfully present in the dwelling or the defendant was armed with a dangerous weapon. MCL 750.110a(2); *People v Wilder*, 485 Mich 35, 43; 780 NW2d 265 (2010).

Pursuant to MCL 750.157a, a defendant "who conspires together with 1 or more persons to commit an offense prohibited by law, or to commit a legal act in an illegal manner is guilty of the crime of conspiracy . . . ." "Conspiracy is a specific-intent crime, because it requires both the intent to combine with others and the intent to accomplish the illegal objective." *Mass*, 464 Mich at 629; see also *People v Justice (After Remand)*, 454 Mich 334, 345; 562 NW2d 652 (1997). "Establishing that the individuals specifically intended to combine to pursue the criminal objective of their agreement is critical because [t]he gist of the offense of conspiracy lies in the unlawful agreement . . . [meaning] . . . [t]he crime is complete upon formation of the agreement . . . ." *Justice*, 454 Mich at 345-346 (quotation marks, citation, and footnote omitted; alterations in original).

Because of the surreptitious nature of criminal conspiracies, "direct proof of the conspiracy is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties." *Id*. at 347. Additionally, "[i]t is not necessary to a conviction for conspiracy that each defendant have knowledge of all its ramifications. Nor is it necessary that one conspirator should know all of the conspirators or participate in all of the objects of the conspiracy." *People v Hunter*, 466 Mich 1, 7; 643 NW2d 218 (2002) (quotation marks and

citations omitted). However, even though "the government need not prove commission of the substantive offense or even that the conspirators knew all the details of the conspiracy, it must prove that the intended future conduct they . . . agreed upon include[s] all the elements of the substantive crime." *Mass*, 464 Mich at 629 n 19 (quotation marks and citations omitted; alterations in original).

The prosecution presented sufficient evidence for a rational jury to find, beyond a reasonable doubt, that defendant Waters participated in a conspiracy to commit first-degree home invasion and armed robbery. First, there was substantial evidence from which the jury could reasonably conclude that defendant Waters intended to combine with McCants in order to execute a home invasion of Brenda's residence and robbery of items or money inside, including (1) the text messages between Waters and McCants discussing whether Waters would get his "cut," (2) other text messages likely referring to the robbery, and (3) most importantly, Waters' statements during his interview with the police.

Waters admitted during the interview that he was expecting a cut from the robbery and that McCants called him around 10:40 p.m. that night, stating that "they had just robbed a house and there weren't nothing in there. All they got was a shot gun and a TV, and that was it." Waters later stated that he specifically asked McCants what had happened after the robbery. Additionally, he expressly acknowledged that, while they were at Brenda's house purchasing marijuana, McCants (1) said something to Waters about going back to the house later that night and, in the context of that statement, (2) asked if Waters thought that there was anything inside Rand's house. Defendant Waters said that he replied, "There's probably something, but probably not . . . ." However, Waters also said that he told McCants—knowing that McCants had robbed "a lot" of drug dealers in Detroit[16]—that Rand sells "a lot" of weed and, as a result, "probably got some money." Although Waters repeatedly stated that he did not actually execute the robbery, he expressly confirmed that it was "fair enough to say" that he "helped formulate the plan."

A rational jury could reasonably *infer* from Waters' statements, combined with the phone records indicating extensive contact between Waters and McCants on the day of the robbery,[17] that Waters intended future conduct that included the "armed or occupied" element of first-degree home invasion. See MCL 750.110a(2); *Wilder*, 485 Mich at 43. Likewise, based on this evidence, a rational jury could infer (1) that Waters intended that a robbery would be committed using means of force, violence, assault, or fear, or (2) that the larceny would be committed with a dangerous weapon, or in conjunction with the representation of having a dangerous weapon. See *Chambers*, 277 Mich App at 7. See also *Nowack*, 462 Mich at 400; *Malone*, 287 Mich App at

---

[16] Notably, Waters responded affirmatively when Fraser asked if "that's [McCants'] thing."

[17] On December 16, 2014 alone, Waters contacted McCants 29 times, and McCants contacted Waters 20 times. The cell phone records also showed that there was "a change of behavior" between the two men that day, as they were in touch more that day than any other day that month.

654. Again, "direct proof of the conspiracy is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties." *Justice*, 454 Mich at 347.

Given Waters' explicit confirmation that he helped to formulate the plan, this case is distinguishable from conspiracy cases involving first-degree home invasion or armed robbery offenses where there was absolutely no evidence in the record that the defendant was aware while developing the conspiracy that the home invasion would be committed while armed or while the home was occupied, or that the exacerbating elements required for armed robbery would be present. Thus, we reject defendant Waters' sufficiency of the evidence claim concerning his conspiracy convictions.

Defendant Waters also contends that the prosecution presented insufficient evidence for the jury to conclude that he aided and abetted the first-degree home invasion and armed robbery offenses. Three elements are required to convict a defendant under an aiding-and-abetting theory of prosecution:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (quotation marks and citation omitted).]

"An aider and abettor's state of mind may be inferred from all the facts and circumstances." *People v Turner*, 213 Mich App 558, 568-569; 540 NW2d 728 (1995), overruled in part on other grounds *Mass*, 464 Mich at 627-628. "The requisite intent for conviction of a crime as an aider and abettor is that necessary to be convicted of the crime as a principal." *Mass*, 464 Mich at 628 (quotation marks and citation omitted). Uttering "words or deeds that might support, encourage, or incite the commission of a crime" constitutes evidence of aiding and abetting. *Turner*, 213 Mich App at 568.

Much of the same evidence that supported defendant's conspiracy convictions supports his convictions for aiding and abetting first-degree home invasion and armed robbery. First, defendant Waters does not dispute that McCants committed the underlying crimes, and the prosecution presented overwhelming evidence at trial that McCants committed the first-degree home invasion and armed robbery with two other perpetrators. See *Robinson*, 475 Mich at 6. Second, there is sufficient evidence that defendant Waters "performed acts or gave encouragement that assisted the commission of the crime . . . ." *Id*. As indicated, Waters was present at the location of the robbery earlier in the day. Waters expressly acknowledged that, in conjunction with their trip to the residence, he told McCants—after McCants mentioned a desire to return to the house later that night—that Rand sells "a lot" of marijuana and "probably" had cash inside Brenda's home. Thus, evidence shows that Waters stated "words . . . that might support . . . the commission of a crime." *Turner*, 213 Mich App at 568. Waters also expressly confirmed that it was "fair enough to say" that he "helped formulate the plan." Lastly, Waters' statements and text messages indicating that he expected a "cut" from the robbery provide circumstantial evidence that Waters intended the commission of the armed robbery and home invasion when he provided verbal assistance. See *Robinson*, 475 Mich at 6.

-23-

Thus, the prosecution presented sufficient evidence from which a reasonable jury could find that Waters aided and abetted the home invasion and armed robbery. See *Dunigan*, 299 Mich App at 582.

## IV. CONCLUSION

For the reasons stated in this opinion, we affirm defendant Bush's convictions, but remand for resentencing in Docket No. 330077. In Docket No. 330589, we affirm defendant Waters' convictions and sentences. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Elizabeth L. Gleicher
/s/ Michael J. Riordan